JANUARY TERM, 1878. 233

The Lowell Machine Shop *vs.* The Atlanta Cotton Factory Co.

---

THE LOWELL MACHINE SHOP *vs.* THE ATLANTA COTTON FACTORY COMPANY.

1. A chancellor has no power, in vacation, to decree specifit performance.

2. An injunction to restrain one from refusing performance is, in effect, a decree for specific performances.

3. Directions to chancellor for moulding order to protect parties till final hearing.

Equity. Contracts. Specific performance. Jurisdiction. Injunction. Practice in the Superior Court. Before Judge HILLYER. Fulton County. At Chambers. February 2, 1878.

Reported in the decision.

McCAY & TRIPPE, for plaintiff in error.

HOPKINS & GLENN; N. J. HAMMOND, for defendant.

WARNER, Chief Justice.

Complainant filed a bill in which it charges that on the 22d of August, 1876, the parties entered into an agreement, by which the complainant agreed to furnish to the defendant certain machinery, as set forth in a schedule attached to the contract, for manufacturing cotton, and the defendant agreed,

on the delivery of the machinery, to make its notes for the price, to-wit: about one hundred and fourteen thousand dollars, payable one-tenth on the 15th January, 1876, and five per cent. of the whole payable 15th of every month thereafter until, and inclusive of, 15th July, 1877, in all nineteen notes, with interest from the date of the bills of lading. It was stipulated in the agreement, that notwithstanding the giving of the notes, the title to the machinery should remain in the Lowell Machine shop until all the notes were paid. It was further stipulated, that on failure to pay any or all of said notes, the complainant should have the right to enter the premises of the defendant, and take possession of and remove said machinery without legal process.

The bill then charges that on the 1st of January, 1877, the parties entered into a second agreement, referring in terms to the agreement of August 22d, 1876, and describing it. The second agreement then set forth that all the machinery had been delivered, and, in addition, under the same terms, other machinery (set forth in a schedule), amounting in all to, with the first lot, about one hundred and nineteen thousand dollars; that the notes provided for in the first agreement had been made and delivered, and that the property included in the second agreement, should be held on the same terms as provided in the first agreement, with the same rights as to it, in the complainant, as was stipulated in the first agreement, as to the property described in the first agreement. The agreements provided that the defendant should keep the property insured for the benefit of the complainant. The agreements provided that the defendant should have the right to use the machinery *until demanded*, after the *non-payment* of any of the notes.

The bill alleged that when the first note became due, it was not paid, but protested; that the complainant sent out an agent to look after the matter, and defendant then recognized complainant's right to remove, and then agreed and pledged that if the complainant would not exercise its right to demand and remove the machinery, the defendant *would*

*not use it,* but *take good care* of it until it paid all that was due; that complainant, trusting to this pledge, did not remove the machinery, but left it in charge of defendant; that as the other notes fell due they were not paid, but protested; that complainant, still trusting to the promise of defendant, and hoping it would succeed in raising the money to pay, still refrained from making the demand as stipulated in the contract; that, subsequently, the parties entered into another agreement, of date 15th November, 1877, by which it was arranged that if defendant would, on the 25th of January, 1878, pay to the complainant the first two notes, with interest and protest fees on all the notes then due, and pay off all the mortgages and liens on its property, and other debts it owed, the complainant would give time on its debt, give up the other seventeen notes, take new ones due at different dates, ranging from date up to July, 1884, and the defendant should give the complainant a mortgage on its real estate and machinery other than complainant's for the security of the last nine notes; that this third agreement stipulated that the complainant should have the same right as to taking possession, etc., on the failure to pay any or all of the new notes, and the defendant took the same duties and obligations as to insurance, etc.; that this third agreement stipulated that the defendant would not use the machinery until it had fully *performed* it by paying the mortgages, the liens and other debts, paying the complainant the first two notes, and giving the mortgage, as stipulated; and that if defendant failed to perform this last agreement, then the rights of the parties should stand as though it had not been made, and the agreement be void.

The bill charged that on the 25th of January, the complainant was here, ready and willing to perform, on its part, and so informed defendant, and that defendant failed and refused to perform, on its part, and that it so informed complainant's agent. The bill charges that the matured notes were about $84,000, and that on the 28th day of January, 1878, the defendant started the mill, and commenced using

the machinery or some part of it; that on the next day complainant, by its agent, demanded the possession; that defendant refused to deliver it; that complainant then demanded permission to enter and take possession and remove it; that defendant refused this; that complainant's agent then said he stood ready to give up defendant's notes on defendant permitting him to take the machinery; that defendant, by its president, still refused to deliver, or permit complainant to take said machinery; that defendant kept its mill locked, and refused to permit complainant's agent to enter at all; that complainant's agent tried to get in, and failed; that he then asked permission to see the machinery, and that defendant refused that; that the machinery is of such a character that its market value will be impaired to the extent of from 33 to 50 per cent. by the use of it even for a short time; that its relation to the other machinery is such that it will take several days to get cotton to it. The bill charged that the defendant is insolvent. The bill prayed an injunction against the defendant's using the machinery, the appointment of a receiver, and general relief. The judge granted a restraining order. At the hearing, the bill was amended, charging that the market price of the machinery had depreciated 10 per cent. since August 22, 1876; that its use for eight months would deteriorate it so that it would not pay the debt by a large amount, and prayed an account for the damages. The prayer of the bill was also amended so as to pray that the defendant might be *enjoined from refusing to permit the complainant to enter on the premises and take possession of the machinery and remove it.*

The answer admits the first two agreements, but denies that any agreement was ever made, or any assurance ever given, that the defendant would not use the machinery, as charged, although the conclusion of the answer intimates that the president only means by this, that no assurance was made in his time. It also denied that the third written agreement had ever been an agreement, though it admitted defendant had executed it and transmitted it to complain-

ant, but said that it had no notice from complainant that it had accepted it, and that it, the defendant, had therefore taken no steps to prepare for its performance. It admitted the refusal and failure to pay on the 25th, or do the other things stipulated. It admitted that the mill had been run, and part of complainant's machinery used, but said that it was not injured by its use—saying nothing, however, as to the effect of the use on its market value. The answer also admitted the demand by complainant's agent, and the defendant's refusal, as stated in the bill. The answer also denies the insolvency.

Annexed to the answer was an affidavit of —— Harris, to the effect that a portion of the machinery of complainant had been used; that he was superintendent; that complainant's agent had, in January, 1878, told him that if defendant would pay all its debts to other people it could snap its fingers at complainant. Harris also says that, at the end of a year, the machinery would be injured 10 per cent.

The complainant read the affidavit of Geo. W. Adair, to the effect that shortly after the first note became due, and was not paid, complainant's agent came to see about the matter, and that he, Adair, was president at the time, and he assured him if he would not move the machinery, the defendant would take care of it; that he recognized his right to take it, but hoped he would not do so, but give them a chance, so that they might raise the money in some way.

Complainant read the affidavits of J. W. English, A. Murphy, E. E. Rawson, directors at the time, to the same effect, Mr. Murphy and Mr. English stating that this assurance was that the machinery should not be used until all due when used was paid, or complainant's consent obtained; and that the utmost good faith would be observed; Mr. Rawson stating the same, and Mr. English and Mr. Murphy stating that, to the best of their memory, the assurance was given to complainant's agent at a meeting of the board, or executive committee, at which such agent was present.

Complainant read affidavits of Mr. W. R. Phillips, Mr. R. H. Richards, and Mr. G. W. Parrot, to the effect that the running of factory machinery for making goods, even for a short time, would injure its market value ; Mr. Parrot said 20 per cent., Mr. Richards, something like 20 per cent., and Mr. Phillips, from 15 to 20. These affidavits showed that they had been engaged in cotton manufacturing, and understood the subject. Mr. Parrot also stated that cotton-manufacturing machinery had depreciated in the market in the last eighteen months 10 to 15 per cent.

Complainant read affidavit of Geo. W. Bedlow, to the effect that after the first note became due, he, as agent of the complainant, came to Atlanta, and that he was assured by Mr. Adair, then president, and by other parties, three of the directors, whom he now remembers, that if complainant would not exercise its right to take possession, the company would not use the machinery until it paid all that would be due, or get the consent of complainant. Also the affidavits of H. K. McCay and R. P. Trippe, to the effect that the agreement dated November 15th, 1877, was not, in fact, formally executed by defendant until about the 9th of December, 1877, and that they then informed Mr. Kimball that the complainant would agree to it. Mr. McCay also stated that on the 21st or 22d of January, he informed Judge Hopkins, the defendant's (then) attorney, that the agreement was here, signed by the complainant; that its agent was ready to accept the money, and do as the agreement provided.

Complainant read extracts from defendant's minutes :

1st. An order, dated 26th January, 1878, reciting that the president had been instructed to get the mill ready to run ; that he had reported it ready, and, thereupon, the board ordered him to start.

2d. A minute, dated 14th November, 1877, reciting that the president had presented the form of an agreement with the Lowell Machine Shop, and then ordered that the officers execute it.

3d. A report of the president of defendant to the direc-

tors, stating the amount of its debt to complainant, and the amount and maturity of the notes; that he had a personal consultation with complainant; that he had offered complainant the following proposition. . . This proposition was accepted. The report then goes on to say that complainant had acted very liberally, etc., etc., and that the arrangement he had made was very advantageous to defendant.

Complainant also read extracts from minutes, showing that, in August last, the president had pawned some of the machinery to secure $400, and that the directors had ordered him to sell it and pay the $400. Also, extracts showing that the machinery had been run, though no cotton in it, before the 25th January, 1878. Also, extracts showing an order to start on the 26th January, 1878.

The defendant read extracts from minutes, to-wit: copy of letter from G. W. Bedlow, without date, saying that the complainant could not consent that the proposition of Mr. Inman should be accepted, as by that it would be put off a year, and only get something then if the profits were $40,-000, and the machinery be damaged 50 per cent.

Appended to defendant's answer were some letters of Mr. Burke, treasurer of the complainant, two dated in October, insisting that defendant's true plan was to pay all its Atlanta debts, and insisting on its paying all liens and mortgages and all debts except complainant's, and other letters from Mr. Burke, dated in December, 1877, and one in January, 1878, using language in reference to the agreement of November, 15, 1877, such as "proposed agreement," "contemplated agreement."

The court, after argument, refused the injunction restraining the defendant from interfering with the complainant, entering the premises and moving away the machinery. He did enjoin the defendant from using the machinery, but required complainant to give a bond, with security of $50,000, in 15 days, or the injunction should fall; and ordered, further, that if the defendant did at any time give bond with

security of one-third of the value of the property, to answer all damages in case the machinery was wrongfully used, the injunction should *ipso facto* be dissolved, without any order of the judge.

Complainant excepts to so much of the judgment as refuses the injunction asked for prohibiting the defendant from hindering the complainant's entering and moving the property, and to the order requiring a bond from complainant, and to the order allowing the injunction to be dissolved on defendant's giving bond as stated.

At the hearing before the judge, counsel said they would not press for the appointment of a receiver.

1. The object of the complainant's bill is to obtain a specific performance of the contract set forth therein on the part of the defendant, in accordance with its covenant and agreement; and the question is whether, by the existing law of this state, a judge of the superior court, acting as chancellor, can, out of term time and in vacation, grant the relief prayed for? The 249th section of the Code declares that the judges of the superior court cannot exercise any power out of term time except the authority is expressly granted. We know of no law which authorizes a judge of the superior court, acting as a chancellor, to make a decree in vacation for a specific performance of a contract, however plain and undisputed the same may be, and know of no decision or precedent in this state to that effect. The judge acting as chancellor, has authority to grant injunctions in vacation to prevent injury and injustice from being done, until the cause can be heard on its merits at the regular term of the court to which it is made returnable.

2. It was insisted on the argument here, that the complainant did not ask for any decree for a specific performance of the contract, but only asked for an order enjoining the defendant from refusing to permit the complainant to enter its premises and take possession of the machinery and to remove it. The complainant was not entitled to that order

(which, for all practical purposes, would have been a specific performance of the contract) until it had been shown, upon the final hearing of the cause, that there had been a breach of that contract, and that the complainant was equitably entitled, in view of the facts of the case, to have it specifically performed by the defendant. It may be true that, from the complainant's view of its own case, the contract should be ordered to be specifically performed, on *motion* before the judge acting as chancellor, in vacation ; but the defendant is entitled to be heard upon that question at a regular term of the court as provided by law, before any such order or decree shall be made, inasmuch as the defendant may then show, if it can do so, the contract to be unfair, or unjust, or against good conscience, as a reason why it should not be specifically performed.    Code, §3190.

3. In the meantime, it is the duty of the chancellor to see to it that the rights of the parties are protected, and especially is it the duty of this court, in the exercise of its revisory powers, to compel parties to perform their contracts in good faith according to the well-established principles of equity in all cases like the one now before us, and, to that end, we affirm the judgment of the chancellor in granting the injunction restraining the defendant from using the complainant's machinery in its factory, but reverse the terms and conditions on which that injunction was granted, and, in view of the facts disclosed in the record, the chancellor is directed to grant the following order in the case, instead of the one heretofore granted by him, without the condition of requiring bond and security of the complainant, to-wit : " Let the writ of injunction issue in the penalty of fifty thousand dollars, restraining the defendant, its officers and agents, from using the complainant's machinery in its factory, as set forth in the complainant's bill, until the further order of the court. But in the event the defendant shall enter into bond, with good and solvent security, to be approved by the chancellor, in an amount equal to the sum of the purchase money

agreed to be paid by the defendant for the machinery, including the amount of the lawful interest due thereon, conditioned to pay to the complainant the eventual condemnation money that may be decreed against it on the final hearing of the cause, then said injunction to be dissolved."

Let the judgment below be affirmed, with directions as herein indicated.